Drew D. Dalton
FORD & DALTON, P.S.
320 S Sullivan Rd
Spokane Valley, WA  99037
Phone: (509) 924-2400
Email: ddaltonlaw@gmail.com
Attorney for Plaintiff.

Rebecca A. Rainey, ISB No. 7525
RAINEY LAW OFFICE
P.O. Box 7726
Boise, ID 83707
Email: becky@raraineylaw.com
Telephone: (208) 417-3010
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF IDAHO

ROBIN JOHNSON, an individual, and as
Personal Representative of the Estate of Craig
A. Johnson,

                   Plaintiffs,

vs.

BONNER COUNTY, a political subdivision of
the State of Idaho, BONNER COUNTY
SHERIFF'S OFFICE, a department of Bonner
County, BONNER COUNTY
UNDERSHERIFF ROR LAKEWOLD, in his
individual and official capacity GARY
MADDEN, in his individual and official
capacity, SHAWN DEEM, in his individual
and official capacity, MIKE GAGNON, in his
individual and official capacity, TED
SWANSTROM, in his individual and official
capacity, and PHIL STELLA, in his individual
and official capacity, and DOES 1-10.

                   Defendants.

Civil Action No. 2:18-cv-244

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED**

ECF Case

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## COMPLAINT

COMES NOW the Plaintiff, Robin Johnson, in her individual capacity and as the executor of the estate of decedent Craig A. Johnson, by and through her attorneys of record, and against Defendants Bonner County Sheriff's Office (BCSO), Bonner County Undersheriff Ror Lakewold, Detective Phillip Stella; Deputy Gary Madden; Sergeant Shawn Deem; Deputy Ted Swanstrom and Deputy Mike Gagnon, hereby complains and alleges as follows:

## INTRODUCTORY STATEMENT

1.      This is a civil rights action pursuant to 42 U.S.C. § 1983, for use of excessive force and deadly force in attempting the arrest Craig A. Johnson on September 26, 2017.  The display of force used in attempting the arrest, and the use of deadly force during the course of the arrest, were in violation of the Fourth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment to the United States Constitution, as well as pendent state law claims arising from the conduct of the defendants;

## JURISDICTION AND VENUE

2.      This Court has jurisdiction of Plaintiff's claims for violations of federal constitutional rights pursuant to 28 U.S.C. § 1331 and § 1343.  This action is authorized and instituted pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 12132, *et. seq.*

COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED - 2

3.      This Court has jurisdiction over Plaintiff's state law claims set forth in this Complaint, pursuant to supplemental jurisdiction to hear related state law claims under 28 U.S.C. § 1367(a).   Both federal and state claims alleged herein arose from a common nucleus of operative facts, the state actions are so related to the federal claims that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

4.      Actions complained of herein took place within the jurisdiction of the United States District Court, District of Idaho, in that one or more of the Defendants reside in Idaho and Plaintiff's claims for relief arose in this District.   Accordingly, venue in this judicial district is proper under 28 U.S.C. § 1391.

## **PARTIES**

5.      Plaintiff, ROBIN JOHNSON, is the widow of the decedent Craig A. Johnson.   She is also the Personal Representative of his Estate.

6.      Defendant BONNER COUNTY is a political subdivision of the state of Idaho.

7.      As a local governmental entity, Bonner County is a sueable person under 42 U.S.C. § 1983.

8.      At all times relevant to this Complaint, Bonner County employee several of the Defendants (police officers) through the Bonner County Sheriff's Office and several of Defendants Does.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 3

9.      At all times relevant to this Complaint, Defendants and Does were acting pursuant to Bonner County's laws, customs, and/or policies applicable to Bonner County.

10.     As the employer of Defendants and Does, Bonner County is vicariously liable for all of the tortious and unconstitutional acts and omissions of the Defendants and Does, committed within the course and scope of their employment.

11.     Defendant BONNER COUNTY SHERIFF'S OFFICE ("BCSO) is a department within Bonner County.

12.     Defendant Bonner County Undersheriff Ror Lakewold ("Undersheriff Lakewold"), was at the time of the events, and now is, the Sheriff of Bonner County. Defendant Undersheriff Lakewold is sued in his individual and official, supervisory capacity.

13.     Defendant Detective Phillip Stella ("Detective Stella") was at all times relevant hereto, acting under the color of state law as an employee and police officer of BCSO.  Defendant Detective Stella is sued in his individual and official, supervisory capacity.

14.     Defendant Deputy Gary Madden ("Deputy Madden"), was at all times relevant hereto acting under the color of state law as an employee and police officer of BCSO.  Defendant Deputy Madden in sued in his individual and official capacity.

15.     Defendant Sergeant Shawn Deem ("Sniper Deem") was, at all times relevant hereto, acting under the color of state law as an employee and police officer of BCSO.  Defendant Sniper Deem is sued in his individual and official capacity.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 4

16.     Defendant Deputy Ted Swanstrom ("Sniper Swanstrom") was at all times relevant hereto acting under the color of state law as an employee and police officer of BCSO.  Defendant Sniper Swanstrom is sued in his individual and official capacity.

17.     Defendant Deputy Mike Gagnon ("Deputy Gagnon") was at all times relevant hereto, acting under the color of state law as an employee and police officer of BCSO.  Defendant Deputy Gagnon is sued in his individual and official capacity.

18.     Defendants Does 1-10 ("Does"), were at all times members of the Sheriff's Office working under the color of law.  Defendants Does are each sued in their individual and official capacities and will be named as discovery is obtained.

19.     Plaintiff served a timely tort claim notice in compliance with the Idaho Tort Claims Act.

20.     Plaintiff is entitled to an award of fees and costs pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205.

## FACTS

21.     On September 24, 2017, Plaintiff Robin Johnson called BCSO to request a health and welfare check on her husband, Craig A. Johnson, with whom she'd had a verbal altercation the night before, from whom she had not heard in approximately 24-hours.

22.     Defendant Deputy Madden responded to the call and at approximately 11:54 p.m. on the evening of September 24, 2017.

23.     Defendant Deputy Madden drove to the couple's cabin home in Coolin, Idaho.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 5

24.     As Deputy Madden parked in the driveway at the front of the home, Craig Johnson appeared on the upstairs deck carrying a firearm.

25.     Craig Johnson had a legal right to possess the firearm.

26.     Craig Johnson had a legal right to use reasonable means to defend himself and his home.

27.     Craig Johnson instructed Deputy Madden to leave the property, using the weapon to demonstrate the ability to defend himself and his property.

28.     Deputy Madden did not believe that Craig Johnson aimed the firearm at him.

29.     Deputy Madden drew his firearm and aimed it directly at Johnson "center mass."

30.     Craig Johnson continued to demand that Deputy Madden leave.

31.     Deputy Madden continued to point his firearm at Craig Johnson "center mass."

32.     Craig Johnson did not verbally express an intent to injure Deputy Madden.

33.     Craig Johnson verbally expressed only a demand that Deputy Madden leave the property.

34.     Craig Johnson can be seen gesturing his weapon towards the exit of the property in insistence that Deputy Madden leave.

35.     Craig Johnson continued to demonstrate an ability to defend himself against the weapon Madden had drawn and aimed "center mass" at him.

36.     After approximately one-minute Craig Johnson retreated into his home.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 6

37.    Following the health and welfare check Deputy Madden contacted plaintiff Robin Johnson and informed her that Craig was at the cabin, that the health and welfare check involved displays of firearms.

38.    Deputy Madden also told plaintiff Robin Johnson that Craig Johnson was "in a bad place" and that she should stay away and give him time to calm down.

39.    Deputy Madden and his partner, Deputy Tim Reynolds, contacted dispatch to determine whether Craig Johnson had any prior felonies so that they could get a warrant for his arrest for felon in possession of a firearm.

40.    Dispatch advised Deputy Madden and Deputy Reynolds that Craig Johnson had no prior criminal history.

41.    Deputy Madden obtained an arrest warrant for Craig Johnson with the charge of felony assault.

42.    On or about September 25, 2017, Deputy Gagnon of BSCO read the report involving the Craig Johnson health and welfare check.

43.    In January of 2017, Deputy Gagnon had been shot by a suspect while attempting to serve a felony arrest warrant.

44.    As of September 2017, Deputy Gagnon still suffered from PTSD related to the January incident.

45.    Deputy Gagnon was concerned that most people [i.e., other officers] did not recognize the "severity of the incident" regarding the health and welfare check.

46.    Deputy Gagnon "made the team [he was] on at the time aware and then eventually everyone aware of what had happened."

47.    Deputy Gagnon of BSCO investigated Craig Johnson.

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 7

48.     Deputy Gagnon was not instructed to investigate Craig Johnson.

49.     Deputy Gagnon wanted to "know what he looks like" and "know what he drives".

50.     Deputy Gagnon went to The Mooseknuckle, Craig Johnson's place of work.

51.     Deputy Gagnon spoke to Craig Johnson's boss about Craig Johnson.

52.     Deputy Gagnon spoke to Craig Johnson's boss using "the rouse was I was still there checking on – on [Craig Johnson's] welfare."

53.     In reality, Deputy Gagnon was "trying to find out more about [Craig Johnson]"

54.     Deputy Gagnon spoke with Deputy Thomson about attempting to apprehend Johnson.

55.     Based solely on the information contained in the dispatch report of the health and welfare check, which resulted in the issuance of the arrest warrant, Deputy Gagnon and Deputy Thomson suspected that Craig Johnson might be in an unstable mental condition.

56.     Deputy Gagnon had no formal training regarding assessing whether a suspect had an unstable mental condition.

57.     Deputy Gagnon had no formal training regarding investigating a suspect with an unstable mental condition.

58.     Deputy Thompson had no formal training regarding assessing whether a suspect had an unstable mental condition.

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 8

59.     Deputy Thompson had no formal training regarding investigating a suspect with an unstable mental condition.

60.     Based solely on the information contained in the dispatch report of the health and welfare check, which resulted in the issuance of the arrest warrant, Deputy Gagnon and Deputy Thomson determined that "[Craig] Johnson may not hesitate to attack a member of the general public."

61.     Deputy Gagnon continued investigating Craig Johnson.

62.     At 1:29 p.m. on September 25, 2017, someone from BCSO called Craig Johnson's cellphone.

63.     Craig Johnson did not answer the 1:29 p.m. phone call from BSCO.

64.     The BSCO caller did not leave a message.

65.     Deputy Gagnon contacted Craig Johnson's wife, Plaintiff Robin Johnson, via phone on September 25, 2017 at approximately 2:24 p.m.

66.     Based on that conversation Deputy Gagnon concluded that it "appeared Johnson was in the midst of a mental event."

67.     Deputy Gagnon did not have any formal training related to drawing such conclusion.

68.     Deputy Gagnon did not have any formal training related to continued investigation or evaluation of an individual who was "in the midst of a mental event."

69.     At approximately 4:30 p.m. on Monday, September 25, 2017 Detective Stella, calling from BSCO, left a voice message on Craig Johnson's phone indicating that he was "following up" on the welfare check from the prior evening.

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 9

70.     At approximately 5:20 p.m. on Monday, September 25, 2017, Craig Johnson texted his wife, plaintiff Robin Johnson stating, "You need to call the police and tell them to back off."

71.     At 5:21 p.m. on Monday, September 25, 2017, Robin Johnson called Detective Stella.  The call lasted 1 minute 44 seconds.

72.     Detective Stella represented to Plaintiff Robin Johnson that he was still assessing whether she had continued concerns regarding Craig Johnson's well-being.

73.     Detective Stella withheld from Plaintiff Robin Johnson that BSCO had secured a warrant for Craig Johnson's arrest on charges of felony assault.

74.     Detective Stella withheld from Plaintiff Robin Johnson that he was considering using BSCO's Emergency Response Team (ERT) to serve the arrest warrant on Craig Johnson.

75.     On September 25, 2017, Deputy Thomson was attempting to determine if Craig Johnson had any prior involvement with law enforcement.

76.     Deputy Thomson contacted law enforcement in Spokane, WA and learned that Craig Johnson had no prior involvement with law enforcement in that location.

77.     Deputy Gagnon and Deputy Thomson relied on Johnson's lack of a criminal record and lack of prior incidents with law enforcement to reach the conclusion that Johnson posed an even more extreme threat to both civilians and law enforcement.

78.     Neither Deputy Gagnon nor Deputy Thompson had formal training regarding the correlation between lack of prior engagement with law enforcement and increased threats towards law enforcement.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 10

79.     Neither Deputy Gagnon nor Deputy Thompson had formal training regarding the correlation between lack of prior engagement with law enforcement and increased threats towards civilians.

80.     Detective Stella's call logs do not indicate that he used the cell phone to make any calls to Craig Johnson on September 25, 2017.

81.     At 7:15 p.m. someone from BCSO called Craig Johnson's cellphone.

82.     Craig Johnson did not answer the 7:15 phone call.

83.     The BSCO caller did not leave a message.

84.     At 7:26 p.m. on Monday, September 25, 2017, Craig Johnson placed a call to BSCO.  The call lasted 13 seconds.

85.     At 7:27 p.m. on Monday, September 25, 2017, Johnson placed a call to his wife, Plaintiff Robin Johnson, that lasted 7 minutes and 30 seconds.

86.     Less than 10 minutes later, at 7:36 p.m. on Monday, September 25, 2017, Craig Johnson called BSCO.

87.     The 7:26 p.m. call from Craig Johnson to BSCO lasted 56 seconds.

88.     BCSO did not return Craig Johnson's 56 second call on September 25, 2017.

89.     BSCO lost or destroyed all record of the 56 second call from Craig Johnson to BSCO made on September 25, 2017.

90.     At 9:31 p.m. on Monday, September 25, 2017, Craig Johnson spoke on the phone with his wife, plaintiff Robin Johnson, for 44 minutes and 25 seconds.

91.     During that call, Craig Johnson told his wife that he contacted the sheriff's office and left them a message.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 11

92.     At the conclusion of that call, Robin Johnson believed that issues with her husband were resolving and that he had made necessary contacts with law enforcement in order to further discuss and resolve any misunderstandings related to the health and welfare check.

93.     At the conclusion of that call, Robin Johnson planned to join her husband at their Coolin residence later in the week, as was their regular habit and routine.

94.     At the conclusion of that call, Robin Johnson had no further concerns about the health and wellbeing of her husband.

95.     Unbeknownst to Robin Johnson, Detective Stella, in conjunction with Undersheriff Lakewold, determined that situation warranted use of the ERT to serve the arrest warrant on Craig Johnson.

96.     No member of the BSCO conducted surveillance on Craig Johnson for purposes of obtaining information regarding his emotional state.

97.     No member of the BSCO instructed, ordered, asked, or suggested that plaintiff Robin Johnson remain available by phone for any purpose.

98.     No member of the BSCO instructed, order, asked, or suggested that plaintiff Robin Johnson inform or report to Defendants the substance of any conversations, in whatever form, including calls, VM, texts, or e-mails she had with Mr. Johnson the day before the shooting.

99.     No member of the BSCO instructed, order, asked, or suggested that plaintiff Robin Johnson inform or report to Defendants the substance of any conversations, in whatever form, including calls, VM, texts, or e-mails she had with Mr. Johnson the day of the shooting.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 12

100.   The BSCO ERT normally has 12 persons.

101.   On September 26, only seven regular members of the ERT were available:

a. Robert Van Buren
b. Ror Lakewold
c. Timothy Reynolds
d. Aaron Walker
e. Phillip Stella
f. Shaun Deem
g. Ted Swanstrom

102.   Riley Flannigan of the Sandpoint Police Department joined forces with the BCSO's ERT for purposes of serving Craig Johnson's arrest warrant.

103.   Detective Stella and Undersheriff Lakewold consciously decided to use the ERT to serve the arrest warrant the morning of September 26, 2017 even though five of the normal team members were not available.

104.   Detective Stella and Undersheriff Lakewold consciously decided to use the ERT to serve the arrest warrant the morning of September 26, 2017 even though the lead sniper, Deputy Swanstrom, had been awake for 17 hours and on shift for 13 hours when the mission began.

105.   Being awake for 17 hours is the functional equivalent of a BAC of .05.

106.   At the time the mission began, Sniper Swanstrom had been awake so long he was unwilling to drive.

107.   Detective Stella and Undersheriff Lakewold consciously decided to disregard the ERT threat assessment and planning protocols.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 13

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

108.    Detective Stella and Undersheriff Lakewold briefed the remaining members of the ERT and deputy Flannigan at approximately 6:30 the morning of September 26, 2017.

109.    The ERT's stated goal was to surround the home and attempt to talk Johnson into coming out of the home and surrendering himself.

110.    The ERT was to do only a callout, not a breach.

111.    Sniper Deem and Sniper Swanstrom were assigned cover the area of the residence where the main door and entry point were located.

112.    An ambulance was placed on standby.

113.    The remaining members of the team arrived in an armored personnel carrier referred to as the "Bearcat".

114.    As the Bearcat entered the Johnsons' private property, it turned on the red and blue lights for identification.

115.    The Bearcat was positioned so that it could view the back of the home.

116.    Detective Aaron Walker was a trained crisis negotiator.

117.    Though Detective Aaron Walker was on the team, Detective Stella consciously decided to not use Detective Walker as a crisis negotiator.

118.    Detective Stella personally communicated with Craig Johnson.

119.    Detective Stella did not have formal training as a crisis negotiator.

120.    Detective Stella alternated contact with Craig Johnson through use of the public address (PA) system to make callouts to Craig Johnson and telephone calls to Craig Johnson.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 14

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

121. Detective Stella called Craig Johnson on his cell phone at 8:30:24 am on September 26, 2017.  The call lasted 23 seconds.

122. Detective Stella called Craig Johnson on his cell phone at 8:31:00 am on September 26, 2017.  The call lasted 8 minutes and 43 seconds.

123. Detective Stella called Craig Johnson at 8:40:19 am on September 26, 2017.  The call lasted 37 seconds.

124. At 8:41 am, Craig Johnson sent three texts to his wife, Plaintiff Robin Johnson.  They read:

  a. "Cops are here guns pointed at me thanks";

  b. "why did you lie to me";

  c. "you told me to call now you know I'm calling you.

125. Craig Johnson tried to call his wife at 8:41.

126. At 8:41, Detective Stella also called Plaintiff Robin Johnson.

127. Detective Stella left a message requesting that she call him back and provided no further information.

128. Plaintiff Robin Johnson had no reason to believe she needed to be at the ready to answer phone calls from her husband or BSCO officers.

129. Plaintiff Robin Johnson was not near her cell phone to receive text messages during the ERT's mission on September 26, 2017.

130. Plaintiff Robin Johnson was not near her cell phone to receive phone calls during the ERT's mission on September 26, 2017.

131. Detective Stella attempted to call Craig Johnson at 8:42:46 and 8:43:57.

132. At 8:44, Johnson again tried to call his wife.

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 15

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

133.    Detective Stella attempted to call Craig Johnson at 8:44:26, 8:45:27, and 8:45:41.

134.    At 8:47, Johnson again tried to call his wife.

135.    Detective Stella attempted to call Craig Johnson at 8:48:14 and 8:50:05.

136.    The 8:50:05 call from Detective Stella to Johnson lasted 23 seconds, ending at 8:50:28.

137.    "Shots fired, suspect down" was reported to dispatch at 8:50:57.

138.    Medical arrived on the scene at 8:55:31.

139.    Deputy Gagnon, who had been stationed at the gate, outside the property, followed medical into the property and the scene of the shooting.

140.    While medical was rendering aid to Craig Johnson, the team went through every room in Johnson's residence.

141.    During the search, Detective Stella unnecessarily kicked in an unlocked door to the guest bedroom.

142.    In their conversations the prior day, Monday, September 25, 2017, Robin Johnson told Detective Stella that Craig Johnson kept the black pistol in the nightstand next to the bed in the master bedroom.

143.    It is the same black pistol that Craig Johnson was holding the night of the health and welfare check.

144.    It is the same black pistol that officers allege was seen on the ground near Craig Johnson body after he was shot.

145.    Deputy Gagnon was wearing a body camera.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 16

146.    Deputy Gagnon did not use the body camera to take any photographs or video of the scene to document Johnson's body position after he was shot.

147.    Deputy Gagnon did not use the body camera to take any photographs or video to document the black pistol that Johnson was allegedly holding when he was shot.

148.    Medical took Johnson away in an ambulance towards the landing zone where life flight was waiting.

149.    Johnson died en route to the life fight landing zone.

150.    Plaintiff Robin Johnson attempted to call Detective Stella at 9:45:07; 10:01:30; 10:16:49; 10:25:25; 10:27:36; 10:47:02; 10:48:06.

151.    Detective Stella did not answer her calls.

152.    All team members except for Detective Stella and Undersheriff Lakewold left the scene and returned to the Marine Building and BSCO headquarters.

153.    Deputy Gagnon transported Sniper Deem to the Marine Building.

154.    During the drive, Deputy Gagnon provided counselling and comfort to Sniper Deem.

155.    Deputy Gagnon assured Sniper Deem that the Idaho State Police would "be there for him"

156.    Detective Prosser of the Idaho State Police was assigned to lead the investigation.

157.    Detective Prosser instructed Kootenai County Sherriff's Office personnel to conduct interviews with only the witness officers.

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 17

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

158.    Interviews with the officers directly involved in the shooting—Sniper Deem and Sniper Swanstrom—would not take place until September 29, 2017, three days after the shooting.

159.    Detective Stella was first interviewed at the scene at 12:50 pm on September 26, 2017 by Detective Brostmeyer.

160.    In his September 26, 2017 interview, the only statements that Detective Stella made regarding his personal, direct observation of the shooting were that he "heard two distinct drop the gun, drop the gun and then heard two distinct shots after that."

161.    Detective Stella did not state that he saw Craig Johnson holding a weapon.

162.    Detective Stella did not state that he saw Craig Johnson exhibit any hostile behaviors towards deputies.

163.    Detective Goodwin interviewed Riley Flannigan at 1:31 on September 26, 2017 at BSCO headquarters.

164.    In his September 26 interview, the only statements that Flannigan made regarding his personal, direct observation of the shooting were that "we got – heard over the radio from the guys on the other side of the house, ah, that he was existing the house, coming towards the vehicle.  I thought at that point he was coming towards our vehicle, so we positioned ourselves to take him into custody."  Then "…waiting I heard a gunshot and I heard shots fired."

165.    Officer Flannigan did not state that he saw Craig Johnson holding a weapon.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 18

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

166.   Officer Flannigan did not state that he saw Craig Johnson exhibit any hostile behaviors towards deputies.

167.   Detective Goodwin interviewed Sergeant Charles Robert Van Burean at 1:36 on September 26, 2017 at BSCO headquarters.

168.   At the time of the September 26, 2017 interview, the only information Deputy Van Buren gave regarding his direct, personal observation of the shooting was he heard the announcement of shots fired.

169.   Sergeant Van Burean did not state that he saw Craig Johnson holding a weapon.

170.   Sergeant Van Burean did not state that he saw Craig Johnson exhibit any hostile behaviors towards deputies.

171.   Detective Goodwin interviewed Detective Aaron Walker at 1:42 on September 26, 2017 at BSCO headquarters.

172.   In his September 26 interview, the only statements Deputy Walker made about his direct, personal observation of the shooting was "I heard over the radio, I – I don't know if it was Sean or Ted say that they saw the suspect come out on the back porch of the number 4 side is what they said on the radio, and that he was coming out, so we all grabbed onto the Bearcat and drove up towards the house.  Just prior to us getting there, I heard two gunshots."

173.   Detective Aaron Walker did not state that he saw Craig Johnson holding a weapon.

174.   Detective Aaron Walker did not state that he saw Craig Johnson exhibit any hostile behaviors towards deputies.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 19

175.    Detective Goodwin interviewed Sergeant Timothy Reynolds at 1:52 on September 26, 2017 at BSCO headquarters.

176.    In his September 26 interview, the only statements Deputy Reynolds made about his direct, personal observation of the shooting were that Johnson "looked at us, started walking away from us towards the woods directly where I guess (Sean) and (Ted) were at and (unintelligible) and they're telling – saying he's coming out of the house and that's when I saw him and he was heading directly back to our – come to find out later where (Sean) and (Ted) were, and um, next thing I know I heard something about a gun, then I hear a gunshot… and I watched the, ah, suspect drop."

177.    Detective Reynolds stated that he actually saw Craig Johnson "drop."

178.    Detective Reynolds did not say anything about Craig Johnson holding a gun.

179.    Detective Reynolds did not say anything about Craig Johnson exhibiting any hostile behaviors towards deputies.

180.    Detective Goodwin interviewed Undersheriff Ror Lakewold at 2:01 on September 26, 2017 at BSCO headquarters.

181.    At the time of his September 26, 2017 interview, the only information Undersheriff Lakewold gave about his direct, personal observation of the shooting was as follows:  "Um, the high ground, ah, guys announced that he was coming out the back, and, ah, so, ah, I put – I put the – the vehicle in drive and started driving around. Ah, as I was, ah, making the approach we were still, um, ah, m, we were still quite a ways away, um ,I'm guessing anywhere – somewhere between 50 and a hundred yards away.  Ah, I could see his back, um, the suspect's back as he's walking down the path,

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 20

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

um, and ah – ah, I could hear Sheriff's Office, um, ah, oddly I didn't hear the shots fired, but I – I heard Sheriff's Office, ah, and then I saw him go down…"

182. Undersheriff Lakewold stated that he actually saw Craig Johnson "go down".

183. Undersheriff Lakewold did not say anything about Craig Johnson holding a gun.

184. Undersheriff Lakewold did not say anything about Craig Johnson exhibiting any hostile behaviors towards deputies.

185. The press release issued by the Idaho State Police on September 26, 2017, stated that the suspect "exhibited hostile behavior to the deputies."

186. Two days later, on September 28, 2017, at 5:17 p.m., the day before the interview of the two involved officers, Detective Neth of the Idaho State Police sent a draft press release to Sherriff Wheeler providing a proposed narrative of the incident.

187. In the draft press released, Detective Neth proposed the following narrative: "Johnson exited his residence with a handgun and confronted the deputies, forcing them to use deadly force."

188. Sheriff Wheeler forwarded the draft press release to Undersheriff Lakewold at 5:23 on September 28, 2017 stating "please take a look at this and verify that this was the chain of event <sic> proceeding <sic> the shooting.  I'm not really liking the format of the press release.  Give me a call after you read it."

189. On Friday, September 29, 2017 at 8:36 a.m., prior to the interviews of the officers involved in the shooting, Undersheriff Lakewold sent an e-mail to Sheriff Wheeler proposing a more detailed narrative of the events.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 21

190.    Undersheriff Lakewold proposed the following narrative: "A short time later Johnson exited the residence attemting <sic> to leave through the woods holding a handgun.  Deputies ordered him to drop the gun and to surrender.  Johnson refused verbal commands and raised his gun towards deputies, forcing them to use deadly force."

191.    After Undersheriff Lakewold circulated his proposed narrative, Detective Prosser interviewed the two snipers directly involved in the shooting.

192.    Detective Prosser interviewed Sniper Deem, the shooter, at 10:05 on September 29, 2017.

193.    Sniper Deem told Detective Prosser the following regarding his personal observations immediately before firing two shots at Johnson:

> I hear Ted screaming, you know, "Drop the gun, drop the
> gun."  He's screaming and then it's just like, oh, shit.  He's –
> he's, um, made contact with us, you know 'cause he's not
> going toward the Bearcat to give up.  He must have come
> back towards us.  And I can't see anything because this
> stupid bush is right in front of me.  And I hear Ted screaming
> a couple of times and then I see the suspect coming right at
> Ted.  And he's got his gun just drawn right on him and I'm
> like, holy shit, where did this guy just come from?  And I just
> pick my rifle up as fast as I could and I put my scope and I
> fired two quick rounds.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 22

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

194.    Later, in that same interview, Sniper Deem related the following additional information regarding Johnson's conduct immediately before Sniper Deem shot him:

> I saw it was a black pistol and he was pointing it in, you
> know, like you're trying to get that perfect shot but he's
> aggressing towards Ted…. Pretty quick. You know, he's
> not running but he's moving pretty quickly. Just dead set on
> going right at Ted. And its just, like holy shit, he's about to
> kill my friend right here. So, that's all I can remember.

195.    Sniper Deem's interview concluded at 10:41.

196.    Detective Prosser interviewed Sniper Swanstrom at 11:08 on September 29, 2017.

197.    At the time of the shooting, Sniper Swanstrom had been awake for approximately 19 hours.

198.    Being awake for 19 hours creates functional deficits equivalent to blood alcohol content of .05.

199.    In his interview, Sniper Swanstrom related the following regarding Mr. Johnson's conduct immediately before he was shot by Sniper Deem:

> I saw pretty much the back of his head, because he was
> looking back towards his house. Towards the team. Um, so
> of course, knowing that we had an arrest warrant for him, I
> stood up, uh, where I was, which was roughly at, say, about
> 20 yards away from him. Um, gave commands – I believe I
> said Sheriff's office, um, and as he walked and turned like

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 23

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

1    that, I could see in his left hand he had a pistol.   A black

2    pistol.  He wasn't carrying it normally as you would go to

3    shoot somebody.  I believe it was backwards with the – with

4    the, uh, pistol grip towards me.  As he was, say, walkin'.  As

5    I made commands to him, I believe I startled him and he

6    kinda paused real quick.  Um, at that time, I noticed the gun.

7    Uh, I verbally yelled, "Gun."  Um, he was able to grab it like

8    that and start raising it up towards me.  So I told – I

9    instructed him – believe it was twice to drop the gun, drop

10   the gun.  Um, at that time, I was startin' to come up.  Um , I

11   wasn't fully on target with my AR.  It was – I wouldn't call it a

12   low ready.  Maybe a medium ready.  Um, I was startin' to

13   come up on target.  Um, 'cause he wasn't droppin' the gun.

14   He wasn't lowering or anything, and I heard Sergeant Deem

15   take off two shots.  Um, at that time, I saw him fall.  So I

16   didn't pull the trigger.

17

18        200.    Later  in  that  same  interview,  Sniper  Swanstrom  described  Johnson's

19   conduct immediately before being shot by Sniper Deem as follows:

20        When I – he – when he comes around the s- thicket, I see

21        him looking back.  Um, i- in a slow walk.  He's not running.

22        He's not doing anything.  He's not yelling.  He's at a slow

23        walk. Um, his hands are moving normally, like someone

24        walking.  And that's when I see the gun in his left hand, in an

25        unusual way of carrying it.  Not, like, with the pistol grips in

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 24

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

1       your – in your palm, getting' ready to shoot or anything.  I

2       believe it was backwards.  Um, and that's when I – I got up,

3       gave announcement to Sheriff's Office.  I- it was either

4       'Sheriff's Office.  Show me your hands.'  Or, because I saw

5       the gun, 'Sheriff's office.  Gun.'  Um, and at that time, he

6       kinda – he had time to grab it around like this.  Come up that

7       way, and that's when he was comin' up.  I yelled, 'Drop the

8       gun.  Drop the gun.'"

9

10       201.    Moments later in that same interview, Sniper Swanstrom related the

11 following version:

12       …as he has his pistol in his left hand, it is, uh, backwards.

13       And at the time that I see him, um, he actually was – was

14       looking away, and I see him and I – I stand up where I was,

15       and that way fully showing myself as law enforcement.  But I

16       – I didn't want to say – I believe I did say, "Sheriff."  Um, it

17       caused him to stop in his tracks.  Uh, look at me.  He moved

18       his right hand from his right side over the front of his body,

19       reaching around to where his left hand was, grabbing the

20       gun in his right hand with the pistol grips in his palm and

21       finger like it would be.  I don't know if it was in the trigger or

22       not, but he grabbed the pistol like that.  Um, came back

23       around and was raising the gun, pointing it at – at myself.

24

25

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 25

202.    In response to Detective Prosser's question "Did he move towards you?" Sniper Swanstrom explained:

> He did not move once I startled him.  Um, the only movem-
>
> he didn't move his feet or step towards me.  Um, the only
>
> movement that I saw was his right hand goin' and grabbing
>
> the I- the gun out of this left hand.  His arm coming back
>
> around, lifting up the gun, and pointing at me.

203.    Detective Prosser did not ask any further questions regarding the material differences between Sniper Swanstrom's account that Craig Johnson was standing still and Sniper Deem's account that Craig Johnson was rapidly aggressing towards Swanstrom.

204.    Sniper Swanstrom's interview concluded at 11:52 a.m.

205.    At 12:56 p.m., Sheriff Wheeler copied Undersheriff Lakewold's re-draft of the press release in an e-mail to Detective Neth.

206.    Detective Prosser rejected the proposed narrative of Sheriff Wheeler and Undersheriff Lakewold's and again proposed the narrative that Detective Neth wrote the night before the Deem and Swanstrom interviews.

207.    Sheriff Wheeler recommended adding the word "loaded" to the description of the handgun Craig Johnson was allegedly holding.

208.    In the final press release, the portion regarding Craig Johnson's conduct immediately prior to being shot was version drafted by Detective Neth on September 28, 2017, the evening before Deem and Swanstrom were interviewed, but with the word "loaded" added to the description of the handgun Johnson was allegedly carrying.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 26

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

209.   When Sniper Deem shot Craig Johnson, Sniper Deem was positioned approximately 10 yards to the left of Sniper Swanstrom.

210.   Craig Johnson was positioned approximately 20 yards away from Sniper Swanstrom.

211.   At the time Detective Prosser and Detective Snell arrived to investigate, orange traffic cones had been set out to highlight the location of the suspect and officers at the time of the shooting.

212.   In a photograph of the cones marking the relative positions of the snipers and Craig Johnson at the time of the shooting taken by Detective Snell, their relative positions were labeled as follows:



213.   The autopsy report identifies one entry wound through Craig Johnson's right shoulder blade with the bullet exiting through Johnson's left shoulder blade.

214.   The autopsy report identifies one entry wound through Craig Johnson's right side abdomen, exiting through Johnson's left side abdomen, with entry and exit wounds through Criag Johnson's left elbow.

215.   Mission planners, Detective Stella and Undersheriff Lakewold, consciously decided to not complete an ERT Threat Assessment form.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 27

216.    The ERT Threat Assessment Form calls for the mission planners to identify the rules of engagement, including the use of force policy.

217.    Sniper Swanstrom's and Sniper Deem's role in the mission was observe and report anything seen, let the team know if Craig Johnson fled through the woods, and provide cover for the safety of the team.

218.    The Snipers' role in the mission did not involve attempting to prevent Craig Johnson from fleeing.

219.    The Snipers' role in the mission did not involve attempting to disarm Craig Johnson.

220.    The Snipers' role in the mission did not involve engaging with Craig Johnson.

221.    In executing the mission, all ERT team members disregarded the BCSO policy that required the use of body cameras.

222.    There were no identifiable fingerprints on the weapon that Craig Johnson was allegedly holding by the barrel.

223.    There was no identifiable DNA on the weapon that Craig Johnson was allegedly holding by the barrel.

### COUNT I

### 42 U.S.C. § 1983

### Excessive Force:  Detective Stella and Undersheriff Lakewold

224.    Plaintiff hereby adopts and re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 28

225.    Defendant Detective Stella and defendant Undersheriff Lakewold, acting under color of state law, used excessive force when they decided to use the ERT to serve the arrest warrant on Craig Johnson; use of excessive force was in violation of the Fourth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment of the Constitution of the United States.

226.    The decision to use the ERT to serve the arrest warrant gives rise to both individual and supervisor liability.

227.    Supervisor liability exists for setting into motion a series of acts by others which they knew or should have known would cause others to inflict constitutional injury; for their actions or inactions in training, supervising, and controlling the ERT Team members, and/or for conduct that showed a reckless or callous indifference to the constitutional rights of Craig Johnson to be free from unreasonable seizures.

228.    Based on a totality of the circumstances, the decision to utilize the ERT to serve the arrest warrant on Johnson, was objectively unreasonable and constitutes excessive force.

229.    The circumstances that made use of the ERT for service of the arrest warrant on Craig Johnson objectively unreasonable include, but are not necessarily limited to the following:

      a. The conduct of Craig Johnson that lead to the issuance of the arrest warrant was an isolated incident in which Craig Johnson was surprised at his private residence at midnight by an unexpected visitor; demonstrated the ability to protect himself and his property by displaying a firearm he lawfully possessed, continued to display the firearm in a demonstration of

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 29

the ability to protect himself and his property after the unexpected visitor drew a firearm and pointed it "center mass" at him; and retreated into his private residence, without incident, less than one minute after the unexpected visitor arrived;

b. At the time the decision was made to deploy the ERT, Craig Johnson did not pose an immediate threat to the safety of law enforcement and Defendant Detective Stella made a conscious decision to recklessly ignore evidence to the contrary;

c. At the time the decision was made to deploy the ERT, Craig Johnson did not pose an immediate threat to the safety of the general public and Defendant Detective Stella made a conscious decision to recklessly ignore evidence to the contrary;

d. Defendant Detective Stella made the conscious decision to not advise Craig Johnson or his wife, Plaintiff Robin Johnson, that the arrest warrant had issued;

e. Craig Johnson was unaware that the arrest warrant had issued;

f. Craig Johnson was not actively resisting arrest or attempting to evade arrest.

g. Craig Johnson cooperated with law enforcement prior to deployment of the ERT by making a phone call to BCSO in an effort to discuss the matter;

h. Robin Johnson had cooperated with law enforcement by timely returning phone calls and providing information requested by BSCO;

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 30

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

i.   The arrest warrant issued less than 18 hours prior to deploying the ERT.

j.   There was no urgency in serving the arrest warrant on Craig Johnson.

k.   Detective Stella and Undersheriff Lakewold had ample time to further investigate Craig Johnson; ample time to make an informed, reasoned, and reasonable decision regarding the type and amount of force necessary to serve the arrest warrant on Craig Johnson and consciously decided to move forward with an understaffed team in an unplanned mission against a suspect who posed no immediate threat to law enforcement or the general public;

l.   Contact made by Detective Stella to Craig Johnson prior to the ERT mission was made under the false pretense of following up on the welfare check;

m.  Contact made by Detective Stella and Deputy Gagnon to Robin Johnson was made under the false pretense of following up on the welfare check;

n.   Contact made by Deputy Gagnon to Craig Johnson's employer was made under the false pretense of following up on the welfare check;

o.   The use of the ERT, which included six armed officers in an armored tactical vehicle and two snipers hidden off the front door of the Johnson residence, is an overwhelming and excessive show of force for purposes of apprehending a suspect who posed no immediate threat to officers or the general public;

p.   No attempt was made to get Craig Johnson to voluntarily surrender;

**COMPLAINT FOR DAMAGES JURY
TRIAL REQUESTED** - 31

q.  No attempt was made to work with Robin Johnson to get Craig Johnson to voluntarily surrender;

r.  No attempt was made to work with Craig Johnson's employer to get Craig Johnson to voluntarily surrender;

s.  BSCO did not have a search warrant for the Johnson property; accordingly, there was no need for BSCO officers to be physically present at the Johnson residence in order to serve the arrest warrant;

t.  There were no lives at risk;

u.  To the extent any lives were at risk, full culpability for such risk rests with the officers for recklessly creating an increased risk of harm and escalation of the encounter to one where excessive/deadly force could become necessary by electing to serve the arrest warrant at the Johnson home when they knew that Craig Johnson was in lawful possession of firearms;

v.  It was practical for officers to advise Johnson that the arrest warrant had issued and to attempt to negotiate surrender with him without an unnecessary, excessive, unreasonable display of force;

w.  The officers were not responding to a domestic violence situation and none was ever reported or suggested;

x.  The officers believed that Craig Johnson's uncharacteristic response to the health and welfare check was the result of an emotional disturbance or other "mental event";

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 32

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

y.   Based on Robin Johnson's report to Detective Stella and Deputy Gagnon of the Memorial Day incident, reasonable officers would have further investigated the circumstances of that encounter in which they would have learned that Johnson was a non-violent, law abiding citizen, who was generally supportive of police officers; however, both officers unreasonably and recklessly chose to disregard the severity of the reported officer conduct and to baselessly assume that Craig Johnson acted unreasonably and with animus to law enforcement in that situation;

z.   There was no probable cause for an officer to believe that Craig Johnson's demonstration of the ability to defend himself and his home when surprised by an unexpected visitor at midnight on a Sunday night was a crime involving the threatened infliction of serious physical harm;

aa. Other factors known to BSCO that made use of the ERT objectively unreasonable include (i) confirmation that Craig Johnson had no prior involvement with law enforcement; (ii) confirmation that Craig Johnson had no criminal history; (iii) confirmation that Craig Johnson had no history of violent or aggressive behavior to the general public; (iv) confirmation that Craig Johnson, a member of the local search and rescue team, was regarded as a calm, level-headed citizen.

230.   The requirement to execute an arrest warrant in a manner and under conditions that are objectively reasonably given the totality of the circumstances is well defined by law.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 33

231.    Detective Stella and Undersheriff Lakewold knew, or reasonably should have known, that the deployment of the ERT under the totality of the circumstances was reckless and/or unreasonable exercise of force that was so closely related to the depravation of Johnson's rights to be free from unreasonable seizure to be the moving force that cause the ultimate injury:  Craig Johnson's death.

232.    As a result of the violations of the constitutional standards set forth herein, Craig Johnson was wrongfully killed, and his wife, Plaintiff Robin Johnson, suffered the loss of the care, comfort, society, and support of her husband, as well as emotional and mental trauma resulting from the death of her husband.  The extent of damages will be fully proven at trial.

233.    Plaintiff was required to hire attorneys to represent her in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

## 42 U.S.C. § 1983

### Excessive Force:  Reckless Creation of Danger

### Defendants Madden, Stella, Lakewold, Gagnon, Swanstrom & Deem

234.    Plaintiff hereby adopts and re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

235.    The conduct of defendant Detective Stella and defendant Undersheriff Lakewold, defendant Deputy Gagnon, defendant Deputy Madden, defendant Sniper Swanstrom, and defendant Sniper Deem, acting under color of state law, needlessly and recklessly created unreasonably dangerous circumstances that resulted in the use

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 34

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

of excessive, lethal force against Craig Johnson in violation of the Fourth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment of the Constitution of the United States.

236.   Craig Johnson was entitled to be safe and secure from undue and unreasonable use of force in the execution of the arrest warrant against him.

237.   Officers have a duty to not engage in reckless conduct that gives rise to the need to use excessive or deadly force against a suspect.

238.   In breach of that duty and in violation of Craig Johnson's rights, defendants engaged in a course of reckless and malicious conduct that needlessly and recklessly led to the creation of an unreasonably dangerous set of circumstances resulting in the use of excessive, deadly force against Craig Johnson.

239.   The reckless and malicious actions of defendants, each of them acting alone and in concert with each other, that contributed to the unnecessary and unreasonably dangerous circumstances surrounding the use of excessive and lethal force against Craig Johnson include, but are not necessarily limited to, the following:

   a. All named defendants' malicious, reckless, conscious decision to disregard evidence that Craig Johnson was a non-threatening, law abiding citizen as evidence by (i) lack of any prior criminal history; (ii) lack of any prior involvement with law enforcement; (iii) lack of any evidence that Johnson ever behaved in a threatening manner to any member of the general public;

   b. All named defendants' malicious, reckless, conscious decision to disregard the totality of the circumstances surrounding Craig Johnson's

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 35

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

reasonable, non-felonious conduct on the night of the health and welfare check when he was startled awake at midnight at his private residence, lawfully armed himself with a firearm to confront the unexpected visitor, lawfully demonstrated the ability to defend himself and his property against the unexpected visitor, lawfully demanded the unexpected visitor leave his private property, lawfully continued to demonstrate the ability to defend himself after the unexpected visitor aimed a gun "center mass" at him; and calmly retreated into his home after fully assessing and processing the identity of the unexpected visitor and assuring his own safety;

c. Detective Stella's and Undersheriff Lakewold's malicious, reckless, conscious decision to use the ERT to serve the arrest warrant on Craig Johnson in less than 18 hours after it had issued, despite the following:

    i. Craig Johnson posed no immediate threat to law enforcement;

    ii. Craig Johnson posed no immediate threat to the general public;

    iii. Craig Johnson was cooperating with authorities by returning BSCO phone calls;

    iv. Craig Johnson's wife, Plaintiff Robin Johnson, was cooperating with authorities by returning BSCO phone calls and providing relevant information;

    v. Craig Johnson's employer, was cooperating with authorities by providing relevant information;

    vi. Five of the usual members of the ERT were unavailable;

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 36

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

vii.  The lead sniper, Deputy Swanstrom, had been on shift for 17 hours at the time the ERT mission commenced.

d.  Detective Stella's reckless, conscious decision to not advise Craig Johnson that an arrest warrant had issued;

e.  The reckless, conscious decision to not advise Craig Johnson's wife, Plaintiff Robin Johnson, that an arrest warrant had issued;

f.  The reckless, conscious decision to affirmatively misrepresent police intentions to Craig Johnson's wife, Plaintiff Robin Johnson;

g.  The reckless, conscious decision to affirmatively misrepresent to Craig Johnson that the purpose of police phone calls was to "follow-up on the health and welfare check";

h.  The reckless, conscious decision to affirmatively misrepresent to Craig Johnson's employer that inquiries regarding Craig Johnson's whereabouts, habits, and schedules were in furtherance of a health and welfare check;

i.  The reckless failure of BSCO to answer Craig Johnson's call the night before the ERT was deployed to the Johnson residence;

j.  The reckless failure of BSCO to return the call made by Craig Johnson the night before the ERT was deployed to the Johnson residence;

k.  The malicious, reckless, unsupported assumption that Craig Johnson possessed an animosity towards law enforcement;

l.  The malicious, reckless, unsupported assumption that Craig Johnson posed a threat to law enforcement;

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 37

m. The malicious, reckless, unsupported assumption that Craig Johnson posed a threat to the general public;

n. Sniper Swanstrom's reckless disregard of his role in the mission in deciding to identify himself in response to Craig Johnson walking calmly away from his home;

o. Sniper Deem's reckless disregard of the harm to come to Craig Johnson when firing two shots at Craig Johnson in response to Sniper Swanstrom's recklessly engaging with Craig Johnson;

240.   The duty to refrain from reckless or malicious conduct that gives rise to the need to use excessive or deadly force is well defined by law.

241.   All named defendants knew, or reasonably should have known, that their malicious, reckless conduct created a totality of circumstances that gave rise to their use of excessive and deadly force in violation of Craig Johnson's right to be free from unreasonable seizure of his person, in violation of the Fourth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment of the United States.

242.   The malicious and reckless conduct of the individual defendants listed above operated at the same time to independently and concurrently cause and contribute to the unreasonable use of excessive and deadly force against Craig Johnson.

243.   As a result of the violations of the constitutional standards set forth herein, Craig Johnson was wrongfully killed, and his wife, Plaintiff Robin Johnson, suffered the loss of the care, comfort, society, and support of her husband, as well as emotional and

mental trauma resulting from the death of her husband.  The extent of damages will be fully proven at trial.

244.   Plaintiff was required to hire attorneys to represent her in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

## 42 U.S.C. § 1983

## Excessive/Deadly Force:

## Defendants Swanstrom & Deem

245.   Plaintiff hereby adopts and re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

246.   The conduct of defendant Sniper Swanstrom and defendant Sniper Deem, acting under color of state law, in using deadly force against Craig Johnson constituted excessive force in violation of the Fourth Amendment of the Constitution of the United States, made applicable to the states through the Fourteenth Amendment of the Constitution of the United States.

247.   Craig Johnson was entitled to be safe and secure from undue and unreasonable use of force in the execution of the arrest warrant against him.

248.   The rules of engagement did not call for Sniper Swanstrom to attempt to stop Johnson from fleeing.

249.   The rules of engagement did not call for Sniper Swanstrom to attempt to disarm Johnson.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 39

250.   The rules of engagement did not call for Sniper Swanstrom to engage with Johnson in any manner.

251.   Sniper Swanstrom recklessly disregarded the rules of engagement by engaging with Craig Johnson when Johnson was otherwise walking calmly and looking backwards towards his home and/or the ERT vehicle.

252.   At the time Sniper Swanstrom recklessly disregarded the rules of engagement, Craig Johnson was not posing an immediate threat to law enforcement officials.

253.   Immediately after Sniper Swanstrom recklessly disregarded the rules of engagement, Sniper Deem fired two shots from his AR10 at Craig Johnson.

254.   Both shots from Sniper Deems AR10 struck Craig Johnson through the side.

255.   One shot entered Craig Johnson's right side abdomen and exited his left side abdomen, then piercing through Craig Johnson's left elbow.

256.   The other shot entered Craig Johnson's right side shoulder blade and existed his left side shoulder blade.

257.   There is no credible evidence that Craig Johnson raised a gun in the direction of Sniper Swanstrom.

258.   The angle of the entry/exit wounds shows Craig Johnson was not positioned so as to be aggressing towards Sniper Swanstrom.

259.   Craig Johnson was not posing an immediate threat to the safety of officers at the time Sniper Deem shot him through his side and across his back.

**COMPLAINT FOR DAMAGES JURY**
**TRIAL REQUESTED** - 40

260.   The requirement to not engage in the use of deadly force unless the suspect presents an immediate threat to the safety of officers is well defined by law.

261.   The reckless conduct of Sniper Swanstrom directly caused the unreasonable, excessive use of deadly force against Craig Johnson.

262.   Sniper Deem used unreasonable, excessive, and deadly force in shooting Craig Johnson.

263.   As a result of the violations of the constitutional standards set forth herein, Craig Johnson was wrongfully killed, and his wife, Plaintiff Robin Johnson, suffered the loss of the care, comfort, society, and support of her husband, as well as emotional and mental trauma resulting from the death of her husband.  The extent of damages will be fully proven at trial.

264.   Plaintiff was required to hire attorneys to represent her in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT IV

### 42 U.S.C. § 1983

### *Monell* Lialbity:  Bonner County and Bonnor County Sheriff's Office

### Failure to Train

265.   Plaintiff hereby adopts and re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

266.   The acts or failures to act of the above individually named defendants, acting under the color of state law, deprived Craig Johnson of his right to be free from

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 41

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

unreasonable seizure utilizing excessive/deadly force in violation of the Fourth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment of the United States Constitution.

267.   The training policies of defendant Bonner County and BCSO were not adequate to prevent violations of law by its police officers or to train its police officers to handle the usual and recurring situations with which they must deal including, but not necessarily limited to:

    a.  Conducting health and welfare checks at midnight in an area where many citizens legally possess firearms;

    b.  Conducting investigations relating to persons experiencing suspected mental or emotional events;

    c.  Engaging with persons experiencing suspected mental or emotional events;

    d.  Attempting to safely apprehend persons experiencing suspected mental or emotional events;

    e.  Protocols, procedures, and requirements for deploying extraordinary uses of force such as the ERT;

    f.  Use of severely fatigued officers in highly sensitive roles where snap judgment, life and death decisions may be required;

    g.  Use of officers suffering from mental conditions such as PTSD in field operations;

    h.  Use of body cameras.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 42

268.   Defendant Bonner County and Bonner County Sheriff's Office were deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees and for the known or obvious consequences of its failure to train its police officers to handle the usual and recurring situations with which they must deal.

269.   The failure of defendants Bonner County and BCSO to prevent violations of law by its police officers and to provide adequate training to its police officers caused the deprivation of Craig Johnson's rights by Detective Stella, Undersheriff Lakewold, Deputy Gagnon, Deputy Madden, Sniper Deem and Sniper Swanstrom; that is, Bonner County and BCSO's failures to prevent violations of law by its officers and failures to train its officers is so closely related to deprivation of Craig Johnson's rights as to be the moving force that the unreasonable seizure through excessive/deadly force, that caused the death of Craig Johnson.

270.   As a result of the violations of the constitutional standards set forth herein, Craig Johnson was wrongfully killed, and his wife, Plaintiff Robin Johnson, suffered the loss of the care, comfort, society, and support of her husband, as well as emotional and mental trauma resulting from the death of her husband.  The extent of damages will be fully proven at trial.

271.   Plaintiff was required to hire attorneys to represent her in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 43

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

**SUPPLEMENTAL STATE CLAIMS**

**Wrongful Death/Malice, Recklessness, and Gross Negligence and Negligence Against Bonner County, Bonner County Sheriff's Office, and all individual Defendants**

272.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

273.     Defendants Bonner County and BCSO are liable for damages arising out of the malicious, reckless, and grossly negligent acts or omissions of their employees acting in the course and scope of their employment.

274.     Defendants Deem, Swanstrom, Stella, Lakewold, Madden and Gagnon were at all times hereto acting in the course and scope of their employment.

275.     Defendants Deem, Swanstrom, Stella, Lakewold, Madden and Gagnon failed to exercise ordinary care in investigating Johnson, developing the mission plan to serve his arrest warrant, and take him into custody, which are all part of the daily operational functions of officers of the Bonner County Sheriff's Office.  The actions of such officers in their respective roles were negligent, grossly negligent, reckless, and malicious.

276.     The actions of Defendants Deem, Swanstrom, Stella, Lakewold, Madden, and Gagnon were reckless in that they intentional and knowingly created a situation which put Craig Johnson into a position of unreasonably high probability that Johnson would be killed.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 44

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

277.   The actions of defendants Deem, Swanstrom, Stella, Lakewold, Madden and Gagnon caused Craig Johnson's wrongful death.

278.   Craig Johnson was wrongfully killed, and his wife, Plaintiff Robin Johnson, suffered the loss of the care, comfort, society, and support of her husband, as well as emotional and mental trauma resulting from the death of her husband.  The extent of damages will be fully proven at trial.

279.   Defendants Bonner County and the BCS, Sniper Deem, Sniper Swanstrom, Detective Stella, Undersheriff Lakewold, Deputy Gagnon, and Deputy Madden are liable for the damages they caused, in an amount to be determined at trial.

## Negligent and Intentional Infliction of Emotional Distress
## Against Detective Stella, Detective Gagnon and Detective Madden

280.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

281.   Deputy Madden, Detective Stella and Deputy Gagnon engaged in negligent, intentional and reckless conduct by, among other things, (i) affirmatively misrepresenting to plaintiff Robin Johnson that the purposes of their conversations with and inquiries of her were ongoing actions to secure information about the well-being of her husband, Craig Johnson, when in reality, they were gathering information for purposes of justifying malicious and reckless use of the ERT to serve an arrest warrant on Craig Johnson; (ii) maliciously, recklessly, and deceptively advising plaintiff Robin Johnson to "stay away" and give Craig Johnson time to calm down and cool off when, in reality, they wanted plaintiff to stay away from Craig Johnson so as to not hinder or

FORD & DALTON, P.S.
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

impede their efforts to use the ERT to serve an arrest warrant on Johnson; (iii) using information cooperatively provided by Robin Johnson to maliciously and recklessly fabricate a false picture of Johnson as a violent individual with an animus towards law enforcement in order to justify the unreasonable and unnecessary use of excessive force to serve the arrest warrant on Craig Johnson; and (iv) embellishing and fabricating the information provided to them by Robin Johnson in subsequent investigations conducted by the ISP in order to avoid discipline and scrutiny for their malicious and reckless use of force.

282.   Such conduct is extreme and outrageous;

283.   Deputy Madden, Detective Stella, and Deputy Gagnon's affirmative misrepresentations to Plaintiff Robin Johnson caused her to falsely believe the incident arising from the health and welfare check on her husband was resolving cooperative and without the need for a show of force, that law enforcement officers were allowing Craig Johnson an opportunity to cool off, calm down, and work with them to resolve misunderstandings arising from the health and welfare check, and to unknowingly, falsely relate this information to Craig Johnson the night before he was killed.

284.   As a result of the false information provided by officers to plaintiff Robin Johnson, and then related from plaintiff Robin Johnson to decedent Craig Johnson, one of the last messages sent to plaintiff Robin Johnson by her husband before he was killed was: "why did you lie to me."

285.   Plaintiff Robin Johnson's severe emotional distress resulting from the death of her husband was exacerbated by the knowledge that Deputy Madden,

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

Detective Stella and Deputy Gagnon provided her false information which caused her husband's last thoughts about her to be thoughts of betrayal.

286.    Thereafter, Detective Stella and Deputy Gagnon misrepresented, fabricated, and embellished the information Robin Johnson provided to them out of care and concern for her husband, so that they might individually avoid scrutiny for their malicious, reckless, and negligent involvement in the acts that resulted in the wrongful death of Craig Johnson.

287.    These additional acts were severe and outrageous and, again, further exacerbated the severe emotional distress suffered by Plaintiff Robin Johnson.

288.    The emotional distress suffered by Robin Johnson was and is severe, resulting in, among other things, depression for which she sought counselling, loss of sleep, despondency and difficulty engaging in activities of daily living such as showering and eating, and lost time at work.  The full extent of Robin Johnson's emotional distress damages will be proven at trial.

### **PRAYER FOR RELIEF**

289.    On all claims for relief, Plaintiff prays for judgment that the constitutional rights of decedent Craig A. Johnson were violated through the use of excessive/deadly force;

290.    Against defendants for the state law causes of actions asserted herein;

291.    For all damages available under state and federal law on all claims in an amount to be proven at trial;

292.    For reasonable attorney fees and costs incurred in bringing this action against Defendants.

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 47

**FORD & DALTON, P.S.**
320 S. Sullivan Road
Spokane Valley, Washington  99037
(509) 924-2400 / FAX: (509) 927-1301

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all questions of fact or combined questions of law and fact raised by this Complaint.

Dated this 25th day of September 2019.

DATED this 25th day of September 2019

FORD & DALTON P.S.                    RAINEY LAW OFFICE
Attorney for Plaintiff                Attorney for Plaintiff

BY:___/s/Drew D. Dalton___           BY:___/s/Rebecca A. Rainey_____
Drew Dalton ISB# 10078               Rebecca A. Rainey, ISB No. 7525

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of September, 2019 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the below noted CM/ECF participants:

    1. Heather Yakely          Heather.Yakely@kutakrock.com

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None.

    /s/Drew D. Dalton_____
    DREW D. DALTON

**COMPLAINT FOR DAMAGES JURY TRIAL REQUESTED** - 48