UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN D. JOHNSON,<br><br>       Plaintiff,<br><br>v.<br><br>BONNER COUNTY; BONNER COUNTY SHERIFF'S DEPARTMENT; GARY MADDEN; SHAWN DEEM; TED SWANSTROM; PHIL STELLA; ROR LAKEWOLD; and MIKE GAGNON, in their individual and official capacities; and DOES 1-10,<br><br>       Defendants. | Case No. 2:18-cv-00244-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are four motions: Plaintiff Robin Johnson's Renewed Motion for Termination and Money Sanctions (Dkt. 62), Defendants'[1] Second Motion to Strike Declaration of Plaintiff's Expert Scott Roder (Dkt. 70), and the parties' cross Motions for Summary Judgment (Dkts. 63, 65). On April 12, 2023, the Court heard oral argument and took the motions under advisement.

Upon review, and for the reasons below, Johnson's Motion for Termination and Money Sanctions, Johnson's Motion for Summary Judgment, and Defendants' Motion to Strike are all DENIED. Defendants' Motion for Summary Judgment is GRANTED in part

---

[1] The Defendants are Bonner County, Bonner County Sheriff's Department, Bonner County Undersheriff Ror Lakewold, Shawn Deem, Mike Gagnon, Gary Madden, Phil Stella, and Ted Swanstrom. Because they have filed their motions collectively, the Court will refer to them collectively as "the Defendants."

and DENIED in part.

## II. BACKGROUND

### A. Factual Background

In the autumn of 2017, Plaintiff Robin Johnson separated from her husband, Craig Johnson.[2] Craig was so upset following the separation that Robin became concerned for his welfare. On September 24, 2017, she asked the Bonner County Sheriff's Office ("BCSO") to do a welfare check on Craig. Answering her request, Defendant Deputy Gary Madden traveled to the Johnson's cabin in the remote wilderness outside Coolin, Idaho. Madden arrived at the Johnson cabin around midnight in a marked police car. After getting out of his car, Madden saw Craig emerge from the second story onto the porch above him. Craig had a gun, which he pointed at Madden, shouting "get the f—k off my property," "you're on private property," and, "f—k you, f—k you." Dkt. 67, at 2–3. Madden drew his own pistol and pointed it back at Craig. After a standoff that lasted about a minute, Craig went back inside the cabin and Madden drove away.

Back at the station, Madden swore out an affidavit of probable cause for an arrest warrant based on Craig's threat with a deadly weapon. Concerned, BCSO Deputy Mike Gagnon began talking to people who knew Craig. Robin Johnson told him that Craig, who was upset about the possibility of a divorce, had been drinking, owned several guns, and was not fond of law enforcement. BCSO ultimately secured a warrant for Craig's arrest on charges of felony assault, but it did not tell Craig or Robin.

---

[2] To avoid confusion, the Court will refer to Plaintiff Robin Johnson as "Robin" or "Johnson" and to her husband, Craig Johnson, as "Craig."

Moving quickly, BCSO did not prepare a formal written operations plan. Instead, Detective Phil Stella reviewed the body cam footage from Madden's interaction with Craig and did a mental threat assessment. Undersheriff Ror Lakewold decided it would be best to use BCSO's Emergency Response Team ("ERT") to serve the warrant. The ERT has more firepower and arrives in greater force than a normal police team. The ERT decided to "contain and call-out" Craig, that is, to surround his cabin and demand his surrender. The morning before the warrant was to be executed, Craig called BCSO twice but no record of the conversations—if any occurred—exists.

On the morning of September 26, 2017, the ERT arrived at the Johnson cabin to execute the arrest warrant. The squad had nine members—including a two-man sniper team—and was supported by an armored "Bearcat" vehicle. Deputy Ted Swanstrom was the ERT's primary sniper, and Sergeant Shawn Deem acted as his observer.

The ERT took up positions surrounding the Johnson cabin. The cabin sits in the eye of a J-hook driveway, which loops around the west side of the structure, around the back, and terminates on the southeast side. Deputy Gagnon parked his patrol car near the driveway, on the northwest side of the cabin. Six ERT officers—team leader Detective Stella, Undersheriff Lakewold, and officers Tim Reynolds, Robert Van Buren, Riley Flanigan, and Aaron Walker—were positioned with the Bearcat on the northeast corner of the property, a few dozen feet east of Gagnon's position. The snipers—Deem and Swanstrom—took the high ground on the south side of the property, near a small trail that branched off from the main driveway, in case Craig tried to escape that way. Because the cabin stood between the ERT members, the parties dispute the line of sight that the officers

MEMORANDUM DECISION AND ORDER - 3

had during the ensuing encounter.

Once the officers were in place, Detective Stella announced his presence over a loudspeaker. When nothing happened, he called Craig, telling him that the cabin was surrounded and that he should come out with his hands up. Craig replied that he was not home, then hung up. When Detective Stella called again, Craig again said that he was not home and hung up. Meanwhile, Craig—who was home—texted Robin that the police were at the cabin pointing guns at him. Shortly after the second call with Detective Stella, Craig left the cabin, walked down the stairs, and turned the corner toward the path near Swanstrom and Deem's position.

The Defendants say that, by turning the corner, Craig went out of sight of all ERT members except the two snipers. Johnson disagrees, pointing to testimony showing that both Deputy Reynolds and Undersheriff Lakewold saw Craig when he was shot. Dkt. 12, at 20–21.

Deputy Swanstrom says that Craig was carrying a pistol in his left hand, holding the barrel rather than the handle. As Craig approached him, Swanstrom allegedly stood up, identified himself as a sheriff's deputy, and told Craig to drop the gun. The snipers reported that, rather than dropping the pistol, Craig moved it to his right hand and gripped it by the handle. They say that Craig raised the pistol into firing position as if to shoot Swanstrom. As Swanstrom raised his own weapon, Deem shot Craig twice. Reynolds and Lakewold, who saw Craig fall, did not see him carrying or raising a gun. The parties dispute whether Craig had a gun, and if so, what he was doing with it, whether it was cocked, and where it landed.

MEMORANDUM DECISION AND ORDER - 4

After the shooting, the rest of the ERT closed in on Craig, who was still alive. They found a gun on the ground beside him, though the parties dispute how it arrived there. Detective Stella said he moved Craig's gun from where it fell to a location about five feet away from Craig's head. Tana Haworth, a medical technician who responded to the scene, said an unnamed officer drew her attention to a gun about a foot from Craig's right thigh. She said that, at her request, the officer kicked it about five feet away. Though Craig received medical care, he died on the way to the hospital.

When the Idaho State Police arrived to investigate the incident, Detective Stella had placed cones marking the relative positions of Deem, Swanstrom, and Craig at the time of the shooting, but not the initial position of Craig's gun before it was moved. When the Idaho State Police submitted its report to the Kootenai County Prosecuting Attorney, prosecutors declined to press charges against Sergeant Deem.

## B.  Procedural Background

After paying the necessary bond,[3] Robin Johnson filed a complaint against the Defendants on September 25, 2019. Dkt. 12. Her Complaint alleges that the ERT members are liable under 42 U.S.C. § 1983 for violating the Fourth Amendment by using excessive force in serving their arrest warrant on Craig. She also alleges that Bonner County and the BCSO are liable for failure to train under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1979). Finally, Johnson alleges that all Defendants are liable for wrongful death, reckless

---

[3] This case was originally dismissed with prejudice for failure to prosecute. Dkt. 3. However, upon Johnson's explanation that she needed time to save money for the requisite bonds and because the statute of limitations had not yet run, the Court later vacated its dismissal order. Dkt. 5.

creation of danger, recklessness, and negligence. On March 24, 2023, Johnson voluntarily withdrew her claims for wrongful death, reckless creation of danger, recklessness, and negligence. Dkt. 81, at 2.

On February 4, 2021, Johnson filed a Motion for Sanctions, arguing that, because Defendants did not preserve the initial location of Craig's pistol, the police investigation was a "sham," and that she has "no competent evidence upon which [she] can prepare her case." Dkt. 27-1, at 2. The Court found that Johnson had not established the elements of spoliation and denied her motion without prejudice. Dkt. 46. Defendants also moved to strike the declaration of Johnson's expert Scott Roder Dkt. 32. The Court declined to do so, finding that Roder's declaration was relevant and reliable. *Id.*

Both parties now renew their already-denied motions. Johnson once more asks for spoliation sanctions (Dkt. 62), while Defendants once more ask for Roder's declaration to be stricken (Dkt. 70). Both parties have also moved for summary judgment (Dkts. 63, 65).

### III. LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is appropriate when the moving party can show that, as to any claim or defense—or part of any claim or defense—"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Since the December 1, 2010, amendment to Fed. R. Civ. P. 56, federal

courts have repeatedly found that summary judgment may be requested not only on an entire claim or defense, but also on any part of a claim or defense. *Ridgeway v. Mon-Dak Trucking, Inc.*, 2012 WL 5380343, at *3 (D. Mont. Oct. 5, 2012), (cleaned up) (collecting cases and interpreting the advisory committee notes to the 2010 amendment).

One of the key purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Id.* It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court does not make credibility determinations at this stage of the litigation, as such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). In considering a motion for summary judgment, the Court must also "view[] the facts in the non-moving party's favor[.]" *Zetwick v. Cnty.*

*of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

Yet the Court need not accept allegations by the non-moving party if such allegations are not supported by sufficient evidence. *Anderson*, 477 U.S. at 249. Instead, the nonmoving party "must go beyond the pleadings and by its own evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (noting the nonmoving party must "identify with particularity the evidence that precludes summary judgment"). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (cleaned up).

The standard applicable to motions for summary judgment does not generally change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.*, 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## B.  Motion to Strike

The proper scope of expert opinions is governed by the standard established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny, and now set forth in Rule 702 of the Federal Rules of Evidence. *See Moore v. Deer Valley Trucking, Inc.*, 2014 WL 4956241, at *1 (D. Idaho Oct. 2, 2014). Rule 702 establishes several requirements for admitting an expert opinion. First, the evidence offered by the expert must assist the trier of fact either to understand the evidence or to determine a fact in issue.

*Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); Fed. R. Evid. 702.

Second, the witness must be sufficiently qualified to render the opinion. *Id.* If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may offer expert testimony where: (1) the opinion is based on sufficient facts or data; (2) the opinion stems from reliable principles and methods; and (3) the witness has applied those principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592–93; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The inquiry is flexible. *Primiano*, 598 F.3d at 564.

Ultimately, a trial court must "assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (cleaned up). "Although a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022).

## C. Spoliation and Sanctions

The authority to sanction a party who has despoiled evidence is based on Federal Rule of Civil Procedure 37 and on the court's inherent power to levy sanctions in response to abusive litigation practices. *Leon v. IDX Sys., Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). When Rule 37 is not applicable because there was no associated discovery order, federal trial courts "are invested with inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g &*

*Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (cleaned up). The Court's inherent powers include "the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Id.*

A court has discretion to impose sanctions ranging in severity from minor sanctions, such as awarding attorneys' fees, to more severe sanctions, including permitting a jury to draw an adverse inference against a party responsible for the destruction of evidence, ordering the exclusion of evidence, or even dismissal of claims. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Reinsdorf v. Skechers U.S.A.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013).

The *Reinsdorf* three-prong test is popular nationwide[4] and is used by many courts in the Ninth Circuit,[5] including this one. *See Johnson v. Bonner Cnty.*, 2021 WL 5828025, at *3 (D. Idaho Dec. 8, 2021) (explaining why it is appropriate to use the test despite the Ninth Circuit having never explicitly adopted it). To decide which spoliation sanction, if any, to impose, this test considers: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing

---

[4] The *Reinsdorf* test has been used by the Second Circuit and the Fourth Circuit, as well as by district courts in the Second, Fifth, Sixth, and Seventh Circuits. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520–21 (D. Md. 2010).

[5] For example, the *Reinsdorf* standard has been used by the District of Arizona, the Southern District of California, and the Central District of California. *Suroweic v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D. Ariz. 2011); *Lewis v. Ryan*, 261 F.R.D. 513, 521 (S.D.Cal.2009); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013). This Court has also applied the *Reinsdorf* test. *Dickinson Frozen Foods, Inc. v. FPS Food Process Solutions Corp.*, 2019 WL 2236080, at *6 (D. Idaho May 21, 2019).

party. *Reinsdorf*, 296 F.R.D. at 626.

The exercise of a court's inherent powers must be applied with "restraint and discretion," and only to the degree necessary to redress the abuse. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). Accordingly, the determination of an appropriate sanction for spoliation is "confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (cleaned up).

# IV. ANALYSIS

The Court will address the cross motions for summary judgment, then Defendants' Motion to Strike, then Johnson's Motion for Sanctions.

## A. Motions for Summary Judgment

Defendants move for summary judgment on all of Johnson's claims, arguing that there was no constitutional violation and that, regardless, qualified immunity protects the ERT officers. Dkt. 65. Johnson moves for summary judgment on her *Monell* claim but asks that damages be left to a jury. Dkt. 63. Because these two motions overlap significantly, the Court will analyze the issues they raise rather than considering each motion independently. First, the Court will consider Johnson's Section 1983 excessive force claims and Defendants' arguments for summary judgment on them; especially qualified immunity. Second, the Court will consider Johnson's Section 1983 *Monell* claim, on which both parties seek summary judgment. Finally, the Court will briefly address Johnson's other claims.

### 1.  § 1983: Excessive Force

Johnson alleges that, by using excessive force in their attempt to arrest Craig, Defendants violated Craig's Fourth Amendment right to be free from unreasonable searches and seizures. Specifically, she argues that Defendants Stella and Lakewold used excessive force in deciding to call out the ERT, that Defendants Madden, Stella, Lakewold, Gagnon, Swanstrom, and Deem "needlessly and recklessly created unreasonably dangerous circumstances that resulted in the use of excessive, lethal force" against Craig, and that Defendants Swanstrom and Deem used excessive force by shooting Craig when he posed no threat. Dkt. 12, at 35. Defendants move for summary judgment on the grounds that they are protected by qualified immunity and that, regardless, their actions were reasonable.

### a.  Count I: Stella and Lakewold

Johnson alleges that Detective Stella and Undersheriff Lakewold "used excessive force when they decided to use the ERT to serve the arrest warrant on Craig Johnson." Dkt. 12, at 29. She claims they are liable because they "set into motion a series of acts by others which they knew or should have known would cause others to inflict constitutional injury."[6] *Id.*

The Ninth Circuit used to recognize a similar theory of liability called the

---

[6] Johnson further alleges that liability attaches because of "their actions or inactions in training, supervising, and controlling the ERT members, and/or for conduct that showed a reckless or callous indifference" for Craig's rights. Dkt. 12, at 29. So far as the Court can tell, these two secondary theories are essentially the same as her primary one. The allegedly reckless or callous conduct was the decision to call out the ERT. Likewise, Johnson has not explained how these Defendants' alleged failure to train or supervise led to Craig's death, so the Court must presume that this argument also involves the officers creating a dangerous environment or otherwise provoking Craig.

"provocation rule." *See Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). Under this rule, even a reasonable use of force could result in liability if, looking backward in time, the Court found a "different Fourth Amendment violation that . . . somehow tied to the eventual use of force." *Id.* Thus, if law enforcement officers took unreasonable actions that created a volatile situation leading to the use of force, those unreasonable actions could be a Fourth Amendment violation in and of themselves, even if the ultimate use of force was found to be reasonable. *Id.* at 430. The Supreme Court, however, rejected this theory, holding that it was incompatible with Fourth Amendment jurisprudence. *Id.* at 426. Because Johnson's theory of Fourth Amendment violation rests on the logic of the now-defunct provocation rule, it is not cognizable as pleaded.

Even if it were, qualified immunity would protect these Defendants.[7] Qualified immunity entitles a law enforcement officer "not to stand trial or face the other burdens of litigation" on a section 1983 claim if his conduct did not violate a clearly established federal right. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The qualified immunity inquiry asks two questions: (1) was there a violation of a constitutional right, and if so, (2) was the right at issue clearly established at the time? *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The standard for the second prong is whether every reasonable officer in that situation would know that his actions were unlawful in light of clearly established law. *Mattos v. Aguarano*, 661 F.3d 433, 422 (9th Cir. 2011).

---

[7] "Because supervisory liability is personal liability, an official against whom a claim of supervisory liability is advanced may assert the defense of qualified immunity." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 963–65 (9th Cir. 2009).

Here, even if calling out the ERT violated Craig's constitutional rights, those rights were not clearly established at the time. Johnson has not offered, nor has the Court found, any case with the necessary specificity to put a reasonable officer on notice that it was unreasonable to dispatch the ERT under these circumstances. Thus, not every reasonable officer in this situation would have known that his actions were unlawful in light of clearly established law. In fact, a reasonable officer in the Defendants' position might well have concluded that it was lawful to call out the ERT and arrive in force when serving a warrant on an armed man in a remote area; especially one who was known to be experiencing mental distress and to distrust police. Because Stella and Lakewold did not violate Craig's clearly established constitutional rights, qualified immunity protects them. The Court GRANTS summary judgment for Defendants on this claim.

   b.  <u>Count II: Madden, Stella, Lakewold, Gagnon, Swanstrom, and Deem</u>

Johnson alleges that all the members of the ERT "needlessly and recklessly created unreasonably dangerous circumstances that resulted in the use of excessive, lethal force against Craig Johnson in violation of the Fourth Amendment of the Constitution." Dkt. 13, at 34–35. Like Johnson's similar claim against Stella and Lakewold, this claim is not cognizable after the Supreme Court's decision in *Mendez*. 581 U.S. at 426. Even if it were, the Defendants would be protected by qualified immunity. No party has produced—and the Court has not found—any precedent with the necessary degree of specificity to have given notice to a reasonable officer under these circumstances that his actions were unlawful. The Court GRANTS summary judgment for Defendants on this claim.

MEMORANDUM DECISION AND ORDER - 14

c.   Count III: Swanstrom and Deem

Johnson alleges that Swanstrom and Deem—the two snipers—used excessive force by shooting Craig. Defendants move for summary judgment on qualified immunity grounds. "When summary judgment is sought on a qualified immunity defense, the court inquires whether the party opposing the motion has raised any triable issue barring summary adjudication." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). When there is a genuine factual dispute about a defendant's allegedly unconstitutional actions—"for example, the plaintiff says the defendant gave the inmate the rope to hang himself, but the defendant denies that he gave the inmate the rope"—summary judgment on qualified immunity grounds is generally not appropriate.[8] In these situations, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *see also Liston v. Cnty. of Riverside*, 120 F.3d 965, 974 (9th Cir. 1997) (reversing and remanding a trial court's summary judgment award when the qualified immunity analysis turned on a threshold fact issue); *Herren v. Bowyer*, 850 F.2d 1543, 1547 (11th Cir. 1988) (same).

Here, a threshold fact question stands between the Court and the two-prong qualified immunity analysis. The officers who saw the shooting could not agree on what they saw. On the one hand, both snipers said that Craig was not only holding a gun, but pointing it at Swanstrom. *See* Dkt. 69-2, at 142, 154. On the other hand, both Deputy Reynolds and Undersheriff Lakewold said they saw no gun on Craig when he fell.

---

[8] David J. Ignall, *Making Sense of Qualified Immunity: Summary Judgment and Issues for the Trier of Fact*, 2 Cal. Western L. Rev. 201, 202 (1994).

Deputy Reynolds saw Craig being shot. He said Craig "looked at us, started walking away from us towards the woods directly where I guess [Deem] and [Swanstrom] were at and . . . they're telling—saying he's coming out of the house and that's when I saw him and he was heading directly back to . . . where [Swanstrom] and [Deem] were, and . . . next thing I know I heard something about a gun, then I hear a gunshot . . . and I watched the suspect drop." Dkt. 12, at 20 (cleaned up). In his deposition, Reynolds said that he saw the gun for the first time when he came to examine Craig's body. Dkt. 81-1, at 83–84. When asked whether he had seen the gun before, Reynolds said, "No." *Id.* at 84.

Undersheriff Lakewold, who was driving the Bearcat at the time, also saw Craig being shot—but did not see him carrying a gun. "[T]he high ground guys announced that he was coming out the back and . . . I put the vehicle in drive and started driving around. [A]s I was . . . making the approach. . . we were still quite a ways away . . . I'm guessing anywhere—somewhere between 50 and a hundred yards away. I could see [Craig]'s back . . . as he's walking down the path, and I could hear 'Sheriff's Office' and, oddly, I didn't hear the shots fired, but I heard 'Sheriff's Office' and then I saw him go down." Dkt. 12, at 21. When asked in his deposition whether he saw Craig with a gun, Lakewold said, "I did not." Dkt. 81-1, at 82.

Until it is established whether Craig had a gun, and what he was doing with it, the Court cannot properly determine whether qualified immunity shields Swanstrom and Deem. Defendants correctly assert that no clearly established law would have prevented them from shooting a person who had a pistol pointed at them. In fact, clearly established law protects officers in this situation. *See Long v. City & Cnty. of Honolulu*, 511 F.3d 901,

906 (9th Cir. 2007) ("When an individual points his gun in the officers' direction, the Constitution undoubtedly entitles the officer to respond with deadly force."). Thus, if Craig was pointing a gun at the snipers, they would unquestionably be protected by qualified immunity.

If, however, the snipers shot Craig when he was unarmed or unthreatening, they would have violated his clearly established constitutional rights.[9] At least two cases decided before 2017 "made clear to a reasonable officer that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile." *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022), cert. denied sub nom. *Cnty. of Riverside, California v. Est. of Clemente Najera-Aguirre*, 143 S. Ct. 426 (2022) (cleaned up). In *Hayes v. Cnty. of San Diego*, the Circuit held that police used excessive force when they fatally shot a suspect who was holding a knife pointed tip-down and standing six to eight feet away. 736 F.3d 1223, 1227–28 (9th Cir. 2013). In *George v. Morris*, the Circuit similarly held that it was unreasonable for officers to fatally shoot a suspect who emerged from his home onto his porch with a pistol pointed down. 736 F.3d 829 (9th Cir. 2013).

Of the four witnesses who had eyes on Craig at the time of the shooting, two saw him raising a gun and two did not. On this centrally important question, this incongruous testimony is enough to raise a genuine issue of material fact. As the moving party,

---

[9] In determining whether the law is clearly established, courts may affirmatively consider all relevant authority, not just the cases cited by the plaintiff. *See Elder v. Holloway*, 510 U.S. 510, 516 (1994) (instructing that courts making such decisions should use their full knowledge of their own precedents and other relevant authority).

Defendants bear the burden of establishing that no reasonable trier of fact could find for Johnson, and on the evidence before the Court, they have failed to do so. At summary judgment, the Court cannot properly "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor may it evaluate the credibility of witnesses, *Hanon*, 976 F.2d at 507. Thus, until the critical facts are established, it is premature to determine whether the defendants violated Craig's constitutional rights or whether those rights were clearly established at the time.[10]

Instead, the proper action is to send the threshold fact question to trial, where qualified immunity, not substantive liability, becomes the first question for the jury.[11] *See Ortiz*, 562 U.S. at 184 ("A qualified immunity defense . . . does not vanish when a district court declines to rule on the plea summarily. The plea remains available to the defending officials at trial."). If the jury finds that Craig was holding a gun in a threatening way, qualified immunity will protect the officers. If the jury finds he was not, the trial will proceed to substantive liability. The Court DENIES summary judgment on this claim.

2.   § 1983: <u>*Monell*</u> Claims

a.   <u>Count IV: Bonner County and the BCSO</u>

Johnson's complaint and motion for summary judgment argue that the alleged Fourth Amendment violations Craig suffered were caused by the inadequate training

---

[10] Defendants also argue that, in shooting Craig, Swanstrom and Deem acted reasonably. Because a question of fact remains regarding whether—and how—Craig was holding a gun when Swanstrom and Deem shot him, it is premature to decide whether they acted reasonably. The Court will not grant summary judgment on this basis.

[11] David J. Ignall, *Making Sense of Qualified Immunity: Summary Judgment and Issues for the Trier of Fact*, 2 Cal. Western L. Rev. 201, 217 (1994).

policies of Bonner County and the BCSO (collectively, the "County Defendants"). Her claim is that the County Defendants' "failure to properly train its ERT officers caused the ERT to be unreasonably deployed under a totality of the circumstances, violating [Craig]'s right to be free from excessive force." Dkt. 63-1, at 4.

A local government cannot be sued under Section 1983 for an injury inflicted solely by its employees or agents. *Monell*, 436 U.S. at 694. In other words, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. It may, however, be sued for damages "where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 691.

Failure to train may constitute a basis for *Monell* liability where the failure amounts to deliberate indifference to the rights of those who deal with municipal employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Mere negligence is not enough to establish *Monell* liability. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference: (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim

turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (cleaned up).

A single instance of unlawful conduct is generally not enough to state a claim for municipal liability under Section 1983. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021). Single acts may, however, trigger municipal liability where "fault and causation" were clearly traceable to a municipality's legislative body or some other authorized decisionmaker. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 406 (1997).

Here, Johnson's claim turns on a single instance of allegedly unlawful conduct. She claims that the County Defendants' alleged failure to train, and failure to follow training, permitted the ERT to be called out unreasonably, which created an unsafe environment that caused Craig's death. As her legal authority, Johnson relies on Ninth Circuit Model Civil Jury Instruction 9.25, which provides a fifteen-factor "totality of the circumstances" test to determine whether an officer's actions are reasonable or whether they constitute excessive force. She argues that, based on these fifteen factors, it was objectively unreasonable for Stella and Lakewold to call out the ERT, and that the County Defendants are thus liable under *Monell* for having policies or customs that created the unconstitutional use of excessive force.

This argument fails for at least two reasons. First, Johnson has failed to plead sufficient facts to support a reasonable inference of a constitutional violation. Her theory rests on the idea that the County Defendants' failure to train created an unsafe situation that led to Craig's death. As already discussed, the Supreme Court has rejected this theory of Fourth Amendment violation. *Mendez*, 581 U.S. at 426. Because creating a situation that

arguably provokes the use of lethal force is not enough to create an independent Fourth Amendment violation, Johnson has failed to establish the first element of a failure to train claim.

Second, Johnson has failed to establish that the alleged failures to train constituted an official policy. *Monell* allows municipalities to be held liable for their own acts—not the acts of their employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Thus, a plaintiff must point to an "official policy" showing that the municipality itself sanctioned or ordered the allegedly offending conduct. *Id.* at 480. To constitute an official policy, a decision to adopt a particular course of action must be attributable to an authorized decisionmaker. *Id.* at 481. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–482. When fault and causation are not clearly traceable to a municipality's legislature or another authorized decisionmaker, a single event cannot constitute a policy or custom. *Brown*, 520 U.S. at 406.

Here, Johnson argues that "The County Defendant[s'] failure to train its ERT officers, particularly Stella and Lakewold, resulted in deploying an untrained ERT in a rushed, poorly-planned mission[] that was objectively unreasonable under the totality of the circumstances." Dkt. 63-1, at 5. She does not attribute this alleged failure to train to any authorized municipal decisionmaker. In fact, she lists the two county officials most likely to be decisionmakers—Stella and Lakewold—as the products of the alleged policy, not its authors. Regardless, neither Lakewold, who was an undersheriff, nor Stella, who

was a detective, had final authority to establish policy for Bonner County or the BCSO. Stella reported to Lakewold, who reported to the Bonner County Sherriff, who is never mentioned in this suit.[12] Thus, the failures that Johnson alleges are not attributable to the County Defendants' authorized decisionmakers and do not constitute official policy.

Johnson also argues that the ERT failed to follow its own policies—for instance by failing to conduct annual SWAT training needs assessments, failing to require its officers to complete continuing ERT refresher courses, and failing to complete a written operational plan and threat assessment before dispatching. These arguments misunderstand *Monell* liability. Under *Monell*, it does not matter whether individual officers followed department policy. *See M.A. v. Cnty. of San Bernardino*, 2021 WL 4706716, at \*13 (C.D. Cal. June 24, 2021) (finding that officers' failure to follow the training they received had no bearing on a county's liability for failure to train). Even if the ERT officers acted negligently by failing to follow their own policies, that negligence would not be attributable to the County Defendants.[13] What matters is whether the County Defendants had an official policy that caused a constitutional violation. Here, Johnson has established neither a policy nor a violation.

For these reasons, Johnson has failed to make a showing sufficient to establish the

---

[12] Johnson's Complaint alleges that Ror Lakewold was simultaneously the Undersherriff and Sheriff of Bonner County at all relevant times. Dkt. 12, at 12 ¶ 12. Public records show, however, that Daryll Wheeler has been Bonner County Sheriff since 2008. *See Meet the Sheriffs*, Idaho Sheriff's Association, https://www.idahosheriffs.org/fullscreen-page/comp-jl79g7tg/1af6a255-9e9f-4b9a-bb16-6074bab9352d/40/%3Fi%3D40%26p%3Dag2vn%26s%3Dstyle-jl79g7w5 (last visited 7/11/23).

[13] It would be different if an authorized decisionmaker had affirmatively decided not to adopt such policies, or to sanction a county-wide practice of non-observance, but as already discussed, Johnson has failed to attribute Craig's death to any action by an authorized municipal decisionmaker.

elements of a *Monell* claim, and the County Defendants are entitled to judgment as a matter of law. The Court GRANTS summary judgment for the Defendants on this claim.

### 3. Other Claims

Defendants argue that Johnson's claims of "excessive force" and "reckless creation of danger" are not causes of action in the Ninth Circuit. They also move to dismiss Johnson's state-law claims for wrongful death and negligence. Because Johnson withdrew all these claims, however, these arguments are moot, and the Court need not address them.

### 4. Conclusion

For the reasons above, the Court GRANTS Defendants' motion for summary judgment as to counts I, II, and IV of Johnson's Complaint. As to Count III, summary judgment is DENIED. The Court DENIES Johnson's motion for summary judgment in its entirety.

### B. Motion to Strike

Defendants move to strike Johnson's expert, Scott Roder. Roder is an evidence specialist with an organization called Evidence Room, which specializes in producing animations recreating crime scenes and shootings. Dkt. 27-32, at 1. The Court has already reviewed Roder's declaration and curriculum vitae and found he is qualified to offer an opinion. Dkt. 46, at 9. For this analysis, however, it is useful to reiterate that his experience and training extends beyond creating animations: he has certificates and credited hours in bloodstain pattern analysis, crime scene investigation, SWAT best practices, homicide investigation, wound patterns, and forensic pathology. Dkt. 27-32, at 6.

For this case, Roder developed eight animations purporting to show the sequence of

events that led to Craig's death. Most of these animations show scale models of Craig Johnson and the two snipers mapped onto the terrain where the shooting occurred. They purport to show the parties' movements and lines of sight, as well as the trajectories of bullets. One is labelled as an "autopsy visualization" and purports to show how the bullets passed through Craig.

Defendants requested Roder's "digital raw animation files" to "evaluate how the animation was actually created, the inputs that went into the animations, and to evaluate their scientific and factual basis." Dkt. 71, at 2. Because Roder failed to disclose these raw files, Defendants argue that his animations cannot be tested or replicated by them and so are not reliable under Rule 702. They accordingly ask that his testimony and animations be struck or excluded at trial.

For her part, Johnson stipulates that Roder's animations are offered merely as demonstrative illustrations of Roder's expert opinions, not substantive simulations with independent evidentiary value. She alleges that Defendants already possess all the raw data that Roder reviewed in formulating his opinions. She argues that, by asking for the raw, editable digital files, Defendants are seeking to "piggyback" off her litigation preparation; trying to harness Evidence Room's work for free to create competing animations illustrating their own expert's opinions.[14]

---

[14] This concern is not implausible. Defendants' Expert William Neale filed a report opining that animation experts generally produce their source files for inspection by the opposing party. Dkt. 72, at 5. One of the articles he cites for this proposition offers litigation advice: "If foundational computer files are produced, you and your expert can attempt to recreate the other side's presentation using the same software, and can then tweak their presentation to show the accident from your point of view or the points that favor your side." *Id.* at 6.

The issue here is whether Roder's animations merely illustrate his opinions or whether they are substantive evidence in and of themselves. Like the chicken and the egg, it is a question of which came first. If his expert opinions developed first, informed by an independent review of the evidence and his knowledge and experience, then the animations may properly be considered demonstrative aids and may be shown at the Court's discretion. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 424–25 (4th Cir. 1996); *People v. Duenas*, 281 P.3d 887, 900 (Cal. 2012); *Demonstrative Aids*, 2 McCormick On Evid. § 214 (8th ed.). But if the animations came first, and Roder's opinions are informed by the results of the software he used, then they are substantive simulations and are subject to the requirements of Rule 702. *See Hinkle*, 81 F.3d at 424–25; *Duenas*, 281 P.3d at 900.

The practical distinction between a demonstrative illustration and a substantive simulation "'is the difference between a jury believing that they are seeing a repeat of the actual event and a jury understanding that they are seeing an illustration of someone else's opinion of what happened.'" *Hinkle*, 81 F.3d at 424–25 (quoting *Datskow v. Teledyne Continental Motors Aircraft Prods.*, 826 F. Supp. 677, 686 (W.D.N.Y. 1993)). The bottom line is that juries may not "credit the illustration more than they credit the underlying [expert] opinion." *Id.*; *see also Duenas*, 281 P.3d at 900 ("Animation is merely used to illustrate an expert's testimony while simulations contain scientific or physical principles requiring validation. Animations do not draw conclusions; they attempt to recreate a scene or process, thus they are treated like demonstrative aids.").

If an animation is truly demonstrative, the offering party need only lay foundation before showing it to the jury. *Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1271

(D. Ariz. 2020). In other words, the computer expert who prepared it or some other qualified witness must testify that it "fairly and accurately depicts what it represents," and the opposing party must be allowed to cross-examine. *Id.* In this Circuit, demonstrative aids are generally not admitted into evidence or sent into the jury room for deliberation. *See United States v. Wright*, 412 F. App'x 993 (9th Cir. 2011) (holding that it was not error for a district court to allow a demonstrative aid when it was not admitted into evidence); *Caiyun Mu v. Hyoun Min Oh*, 2017 WL 2211090, at *4 (N. Mar. I. May 18, 2017) (same); *United States ex rel. Poong Lim/Pert v. Dick Pacific/Ghemm*, 2006 WL 568321, *3 (D. Alaska 2006) (finding that demonstratives "are not evidence themselves, but are displayed to assist in understanding the evidence."). *But see Garner v. Hutchings*, 2021 WL 2651806, at *1 n.3 (D. Nev. June 28, 2021) (admitting demonstrative maps into the trial record as exhibits).

Here, Roder's report details his process. Dkt. 80-1, at 20. He says that he reviewed the materials disclosed by both parties, then used a 3D software program called Autodesk Maya and aerial imagery from Google and the BSCO investigation to generate a digital scale model of the path behind the Johnson cabin where the shooting took place. *Id.* He then populated this scenario with scale models of Craig, Deem, Swanstrom, and the final location of the gun, using crime scene photos, aerial imagery, and the orange cones placed by BCSO as location references. *Id.* at 20-21. Using autopsy photos, the autopsy report, and Craig's measurements, Roder also created a scale model of Craig's body purporting to show the path and direction of the bullets that killed him. *Id.* at 21.

Roder then used animation software to set the scale models into motion and reenact

the events as he believes they played out, showing the reenactments from several different angles. His report uses these reenactments to illustrate his conclusions. The language he uses suggests that his understanding of forensic reconstruction dictates the animations, not vice-versa:

> To a reasonable degree of probability based on the science of forensic reconstruction, it is more likely than not that the position of Mr. Johnson's body at the moment he was struck by the first bullet fired by Sergeant Deem was more likely than not the body position depicted at :10 seconds into Exhibit 1.

Dkt. 80-1, at 23.  After describing how each animation is consistent with police reports, photos, and testimony, Roder concludes that they illustrate problems with the version of events told by Swanstrom and Deem. *Id.* at 27-28 ("Craig Johnson would have had a different wound pattern if the claim that Mr. Johnson turned and then switched his gun to the right hand and then raised his arm and targeted Deputy Swanstrom was true."). At the report's conclusion, Roder swore that, "[b]ased upon review of the provided materials, as well as my education, knowledge, and training, the demonstrative exhibits and animations herein are true and accurate to a reasonable degree of medical and scientific certainty." Dkt. 80-1, at 27.

Based on this information, the Court finds that the animations are demonstrative illustrations. They are a product of Roder's review of the evidence and illustrate the conclusions he drew. In other words, the process of recreation and animation illustrated the science: it was not the science itself. Save movement, there is nothing that Roder did with animation software that he could not have done with a grid overlaid on a chalkboard. Thus, the fact that Roder did not turn over his raw animation files will not exclude his animations

under Rule 702.

Provided that Roder testifies that the animations are fair and accurate depictions of the events, and is subject to cross-examination on that subject, the animations may be shown to the jury as demonstrative aids. The Court will include a jury instruction providing that such animations are not exact recreations of the event, but merely illustrations of an expert's evaluation of the evidence. The jury may give them no more credit than they give Roder's testimony. *See Hinkle*, 81 F.3d at 424–25 (requiring a similar jury instruction). As demonstratives, the animations will not be formally admitted into evidence and will not be sent back with the jury for deliberation. Subject to these provisions, the motion is DENIED.

### C.  Motion for Termination and Money Sanctions

Johnson again moves for sanctions against Defendants because she alleges they have spoliated material evidence. Sanctions for spoliation are appropriate when (1) the party having control over the evidence had an obligation to preserve it, (2) the evidence was destroyed with a culpable state of mind, and (3) the evidence was relevant to the moving party's claim or defense. *Lofton v. Verizon Wireless LLC*, 308 F.R.D. 276, 287 (N.D. Cal. 2015). In determining the appropriate sanction, courts generally consider (1) the degree of fault of the party who altered or destroyed the evidence, (2) the degree of prejudice suffered by the opposing party, and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party. *Reinsdorf*, 296 F.R.D. at 626.

Here, Johnson already asked the Court to sanction Defendants for failing to mark the location where Craig's gun first fell, and the Court already declined. It was not persuaded that Detective Stella had a duty to mark the location of the gun, or that the

location was even material to the case. The basis of this renewed motion is that the parties have now completed expert discovery and Johnson's expert has concluded that (1) Stella did have such a duty because (2) the location of the gun is material.

Beginning with the second conclusion, Johnson's expert Curtis Cope says that, if the gun fell to Craig's left side, that would indicate that Craig never shifted the gun to his right hand, as Swanstrom and Deem testified he did. It might even indicate that Craig complied with Swanstrom's command to drop the gun and was unarmed when Deem fired. Thus, for Cope, at least, the location of the gun is material.

Because the location of the gun was material, Cope opines, Stella had a duty to mark where it initially fell. "It is my opinion," he says, "that the failure to mark the approximate location of the weapon as it lay on the ground after [Craig] was shot falls below the standard of care applicable to ERT police work." Dkt. 62-1, at 4. Johnson offers deposition testimony showing that Stella consciously chose not to mark the location of the gun and argues that this conscious choice evidences a culpable state of mind. Johnson points to the testimony of Tana Haworth, the EMT who treated Craig, who said that when she arrived after the shooting, an officer took pains to point out a pistol near Craig's right thigh and kick it away. According to Johnson, this testimony—which contradicts Stella's statement that, upon arriving at the scene, he promptly moved the gun away from Craig's head—indicates that the officers were engaged in a cover-up.

> If Stella, immediately upon approaching [Craig], moved a cocked gun from an unknown and unknowable location to a place of safety approximately 4–6 feet away from [Craig]'s body, then it could not have been laying uncocked . . . one foot

>from [Craig]'s body, conveniently on the right side, when
>Haworth approached, unless someone moved it there.

Dkt. 62-1, at 13–14.

Defendants counter that Cope cannot opine on a breach of duty because it is a legal conclusion.[15] They offer a competing expert who says that evidence preservation is a third priority at crime scenes, coming after officer safety and scene stabilization, and that under the circumstances, the officers acted in harmony with their responsibility to preserve evidence.

The Court will not award sanctions on this basis. Defendants are correct that Johnson's expert cannot create a breach of duty through his declaration. "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058 (9th Cir. 2008). Cope's opinion that Defendants had a duty to mark the location of the gun is an improper legal conclusion. As such, it is not even admissible at trial, let alone independently sufficient to create a legal duty justifying sanctions. The new expert testimony is not enough to overcome the concerns outlined in the Court's previous order on this motion. *See generally,* Dkt. 46. Thus, the motion is DENIED.

## V. CONCLUSION

Because creating a dangerous environment that leads to the use of excessive force is not a cognizable Fourth Amendment violation, most of Johnson's Section 1983 claims

---

[15] They also argue that it is undisputed that the gun was in Craig's right hand when he went down. The Court has already found, however, that this fact is disputed. *See supra* section A(1)(c).

fail. There remains, however, a fact question regarding the conditions under which Deem shot Craig. Johnson's excessive force claim against Deem and Swanstrom will therefore proceed to trial, where the first question for the jury will be whether qualified immunity protects those officers.

Because the animations at issue are presented as demonstrative illustrations, the Court will not strike them. Instead, if the proper foundation is laid for admission, it will instruct the jury that the animations are merely illustrations of Roder's interpretations of the facts, not substantive facts themselves.

Finally, because an expert cannot create a duty or establish a breach by testimony alone, the Court's previous concerns about spoliation remain unresolved. It will not levy sanctions on this basis.

## VI. ORDER

1. Defendants' Motion for Summary Judgment (Dkt. 65) is GRANTED in part and DENIED in part.

   a. Summary judgment is GRANTED as to Counts I, II, and IV of Johnson's Complaint.

   b. Summary Judgment is DENIED as to Count III of the Complaint.

2. Johnson's Motion for Summary Judgment (Dkt. 63) is DENIED.

3. Defendants' Second Motion to Strike Declaration of Plaintiff's Expert Scott Roder (Dkt. 70) is DENIED with prejudice.

   a. The Court will give a jury instruction clarifying that Roder's animations are not an exact recreation of the event, but merely an illustration of his

evaluation of the evidence.

4. Johnson's Renewed Motion for Termination and Money Sanctions (Dkt. 62) is

DENIED without prejudice.

DATED: August 7, 2023

David C. Nye
Chief U.S. District Court Judge